IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs July 1, 2025

**IN RE ALIZAH S.**

**Appeal from the Juvenile Court for Knox County**
**No. 35106      Timothy E. Irwin, Judge**

_____

**No. E2025-00110-COA-R3-PT**

_____

A mother appeals a juvenile court's decision to terminate her parental rights to her child based on three statutory grounds. She also challenges the juvenile court's finding by clear and convincing evidence that termination of her parental rights was in the best interests of the child. Discerning no error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which THOMAS R. FRIERSON, II, and CARMA DENNIS MCGEE, JJ., joined.

Mary Ward, Knoxville, Tennessee, for the appellant, Aliyah S.

Jonathan Skrmetti, Attorney General and Reporter, and Allen T. Martin, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

**OPINION**

FACTUAL AND PROCEDURAL BACKGROUND

This appeal involves the termination of parental rights of Aliyah S. ("Mother") to her child, Alizah S. (born in 2023).[1] Shortly after the child's birth, the Tennessee Department of Children's Services ("DCS" or "the Department") received a referral that

_____

[1] On the child's birth certificate, the section for "Father" was left blank, and a search of the putative father registry revealed no putative father for the child. After the child was removed from her custody, Mother provided the names of three men she believed could be the child's father. The record indicates that a paternity test determined that one of these three men, Anthony S., was the child's biological father. The status of his parental rights, however, is unclear from the record. Only Mother's parental rights are at issue in this appeal.

the child had been exposed to drugs in utero because Mother tested positive for THC when the child was born. The Department investigated the referral and learned that Mother tested positive for THC and cocaine on two separate occasions while pregnant with the child: on May 19, 2022, and on November 10, 2022. When asked about her drug use, Mother admitted that she used cocaine one month before the child's birth, consumed alcohol when she was approximately thirty weeks pregnant, and used THC on a daily basis. Testing of the child's umbilical cord was positive for cocaine and THC.

On January 27, 2023, DCS filed a petition in the Knox County Juvenile Court alleging the child was dependent and neglected "due to in utero drug exposure; maternal drug use; maternal mental health concerns; . . . and paternal inability to provide appropriate care and supervision." That same day, the juvenile court entered an order removing the child from Mother's custody and placing her in DCS's custody. The juvenile court adjudicated the child dependent and neglected due to Mother's substance abuse issues on November 30, 2023. The court found that Mother perpetrated severe child abuse on the child by exposing the child to drugs in utero and ordered that the child remain in DCS's custody. The Department placed the child in a foster home with foster parents who have four biological children (all under the age of 11), another foster child (approximately the same age as the child), and two dogs. The child has remained continuously in this foster home since she was a few days old.

After the child was removed from Mother's custody, DCS developed five permanency plans that were all ratified by the juvenile court. We will discuss the specific requirements of these plans later in this opinion, but the main goal of each permanency plan was to address Mother's drug use. Mother completed several of the permanency plans' requirements, but she repeatedly tested positive for drugs during the custodial episode. After Mother tested positive for cocaine again in July 2024, DCS filed a petition to terminate her parental rights on August 7, 2024.

After hearing the matter, the juvenile court entered an order on January 8, 2025, terminating Mother's parental rights. The court concluded that DCS established three termination grounds by clear and convincing evidence: (1) substantial noncompliance with the permanency plans, (2) severe child abuse, and (3) failure to manifest an ability and willingness to assume custody of the child. The court also concluded that DCS proved by clear and convincing evidence that termination of Mother's parental rights was in the child's best interest.

Mother timely appealed and presents the following issues for our review: (1) whether the juvenile court erred in concluding that DCS established any grounds for termination by clear and convincing evidence and (2) whether the juvenile court erred in concluding that clear and convincing evidence established that it was in the child's best interest that Mother's parental rights be terminated.

STANDARD OF REVIEW

Under both the federal and state constitutions, a parent has a fundamental right to the care, custody, and control of his or her own child. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010) (citing *Troxel v. Granville*, 530 U.S. 57, 65 (2000)); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174-75 (Tenn. 1996) (citing *Nale v. Robertson*, 871 S.W.2d 674, 678 (Tenn. 1994)). Although this right is fundamental, it is not absolute and may be terminated in certain situations. *In re Angela E.*, 303 S.W.3d at 250. Our legislature has identified "'those situations in which the state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought.'" *In re Jacobe M.J.*, 434 S.W.3d 565, 568 (Tenn. Ct. App. 2013) (quoting *In re W.B., IV.*, Nos. M2004-00999-COA-R3-PT, M2004-01572-COA-R3-PT, 2005 WL 1021618, at *7 (Tenn. Ct. App. Apr. 29, 2005)).

Tennessee Code Annotated section 36-1-113 provides the grounds and procedures for terminating parental rights. First, a petitioner seeking to terminate parental rights must prove that at least one ground for termination exists. Tenn. Code Ann. § 36-1-113(c)(1); *In re Angela E.*, 303 S.W.3d at 251. Second, a petitioner must prove that terminating parental rights is in the child's best interest. Tenn. Code Ann. § 36-1-113(c)(2); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

The termination of a parent's rights is one of the most serious decisions courts make because "[t]erminating parental rights has the legal effect of reducing the parent to the role of a complete stranger," *In re W.B., IV*, 2005 WL 1021618, at *6, "and of 'severing forever all legal rights and obligations of the parent or guardian.'" *Id.* (quoting Tenn. Code Ann. § 36-1-113(l)(1)). Consequently, a parent has a constitutional right to fundamentally fair procedures during termination proceedings. *In re Hannah C.*, No. M2016-02052-COA-R3-PT, 2018 WL 558522, at *2 (Tenn. Ct. App. Jan. 24, 2018) (citing *In re Carrington H.*, 483 S.W.3d 507, 522 (Tenn. 2016)).

Tennessee law ensures fundamental fairness in termination proceedings by requiring a heightened standard of proof—clear and convincing evidence. *See* Tenn. Code Ann. § 36-1-113(c)(1); *In re Carrington H.*, 483 S.W.3d at 522. Before a parent's rights may be terminated, a petitioner must prove both the grounds and the child's best interest by clear and convincing evidence. Tenn. Code Ann. § 36-1-113(c); *In re Valentine*, 79 S.W.3d at 546. "Clear and convincing evidence 'establishes that the truth of the facts asserted is highly probable, and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" *In re Serenity B.*, No. M2013-02685-COA-R3-PT, 2014 WL 2168553, at *2 (Tenn. Ct. App. May 21, 2014) (quoting *In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004)).

We review the trial court's findings of fact de novo with a presumption of correctness unless the evidence preponderates otherwise. TENN. R. APP. P. 13(d); *In re Serenity B.*, 2014 WL 2168553, at *2. In light of the heightened standard of proof, we must then make our own determination "as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights." *In re Carrington H.*, 483 S.W.3d at 524 (citing *In re Bernard T.*, 319 S.W.3d 586, 596-97 (Tenn. 2010)).

ANALYSIS

I.      Termination grounds

        a.  Substantial noncompliance with the permanency plans' requirements

The juvenile court terminated Mother's parental rights pursuant to Tenn. Code Ann. § 36-1-113(g)(2), which provides that a parent's rights may be terminated when "[t]here has been substantial noncompliance by the parent . . . with the statement of responsibilities in a permanency plan pursuant to title 37, chapter 2, part 4." To succeed under this ground, DCS must "demonstrate first that the requirements of the permanency plan are reasonable and related to remedying the conditions that caused the child to be removed from the parent's custody in the first place." *In re M.J.B.*, 140 S.W.3d at 656. Conditions that make foster care placement necessary may "include conditions related both to the child's removal and to family reunification." *In re Valentine*, 79 S.W.3d at 547. The Department must then demonstrate "that the parent's noncompliance is substantial in light of the degree of noncompliance and the importance of the particular requirement that has not been met." *In re M.J.B.*, 140 S.W.3d at 656. "Trivial, minor, or technical deviations from a permanency plan's requirements will not be deemed to amount to substantial noncompliance." *Id.*

The Department developed four permanency plans prior to filing the petition to terminate Mother's parental rights. The initial permanency plan, developed on February 13, 2023, required Mother to: (1) complete an alcohol and drug assessment and follow all recommendations; (2) submit to and pass random drug screens, and complete a new alcohol and drug assessment and follow recommendations after any failed drug screen; (3) complete a mental health assessment; (4) take medications as prescribed and cooperate with random pill counts; (5) complete anger management; (6) obtain and maintain housing and provide a copy of her lease to DCS; (7) schedule, request, be on time to, and be sober at visits; (8) demonstrate learned parenting skills and interact with the child appropriately at visits; (9) maintain social security income; (10) be driven by a licensed driver; (11) comply with court orders, cooperate with DCS, and notify DCS of any change in circumstances; (12) cooperate with a post-severe abuse review; (13) obey all laws; (14) if no conflict, attend the child's appointments; and (15) provide DCS with a list of appropriate relative resources for the child to exit custody.

- 4 -

The second and third permanency plans were created on May 5 and August 16, 2023, respectively. These plans contained substantially the same responsibilities as the initial permanency plan but added the requirement that Mother participate in therapeutic visits with the child and removed the requirements that she provide DCS with a list of relative resources and that she cooperate with a post-severe-abuse review. The Department created the fourth permanency plan on January 24, 2024. Mother's requirements under this plan remained substantially the same, but the plan removed the requirement that she participate in therapeutic visits and added back the requirement that she cooperate with a post-severe-abuse review. The plan also added the requirement that, if concerns about Mother's parenting continued, she must complete a parenting assessment and follow all recommendations.

The juvenile court ratified all of these plans and found that the responsibilities outlined in them were reasonable and related to remedying the conditions that necessitated foster care placement. We agree. Most of the plans' requirements related to remedying Mother's drug use, which caused the child to be removed from her custody. The requirements relating to Mother's parenting, mental health, housing, visitation, and Social Security income pertained to the goal of family reunification.

Mother contends that DCS failed to establish this ground by clear and convincing evidence because she completed the majority of the permanency plans' requirements. She correctly points out that she completed a parenting class and a mental health assessment and received mental health treatment at the Helen Ross McNabb Center. Mother also maintained her Social Security income, and the DCS caseworker testified that Mother obtained appropriate housing. Mother regularly visited the child and acted appropriately during the visits. She completed a drug and alcohol assessment and participated in three different drug treatment programs—Evolve, Stepping Stones, and Great Starts. Although Mother did not complete the first two drug treatment programs, she did complete the Great Starts program.

We commend Mother for the progress she made toward completion of the plans' requirements, but a court's analysis of this termination ground "'involves more than merely counting up the tasks in the plan to determine whether a certain number have been completed[.]'" *In re Bradford H.*, No. M2024-01432-COA-R3-PT, 2025 WL 2413174, at *15 (Tenn. Ct. App. Aug. 21, 2025) (quoting *In re Carrington H.*, 483 S.W.3d at 537). The juvenile court found that Mother was substantially noncompliant with the permanency plans' requirement that she submit to and pass drug screens, a requirement that was related to the primary reason the child entered foster care—Mother's drug use. We agree with Mother that the record contains evidence showing that she routinely submitted to drug screens and that she passed more than thirty urine drug screens during the custodial episode.

Nevertheless, the juvenile court found that Mother was substantially noncompliant with this requirement because she continued testing positive for drugs on nail bed drug screens. In particular, on November 2, 2023, while in the Great Starts treatment program, Mother tested positive for fentanyl on a nail bed drug screen. Furthermore, we, like the juvenile court, consider it particularly concerning that, after completing the Great Starts program, Mother tested positive for cocaine on three nail bed drug screens between January 8, 2024, and July 3, 2024. She also had an administrative positive nail bed drug screen approximately six weeks before trial when she failed to report for a random nail bed drug screen on September 18, 2024. Thus, we agree with the juvenile court's finding that Mother failed to maintain her sobriety—the most important requirement of the permanency plans. *See Dep't of Child.'s Servs. v. Wright*, No. M2008-01607-COA-R3-PT, 2009 WL 302292, at *7 (Tenn. Ct. App. Feb. 6, 2009) (holding that a parent's "fail[ure] to comply with the single most important requirement of the permanency plan" constituted substantial noncompliance); *see also In re Defari R.*, No. E2022-00550-COA-R3-PT, 2023 WL 5624728, at *6 (Tenn. Ct. App. Aug. 31, 2023) (holding that, despite meeting "all other permanency plan requirements, failure to meet one requirement can constitute substantial noncompliance"). We conclude that the juvenile court properly terminated Mother's parental rights pursuant to this ground.

### b. Severe child abuse[2]

The juvenile court also terminated Mother's parental rights pursuant to Tenn. Code Ann. § 36-1-113(g)(4), which provides, in pertinent part:

> Under a prior order of a court . . ., a child has been found to be a victim of severe child abuse, as defined in § 37-1-102, and the parent . . . has been found to have knowingly or with gross negligence either committed severe child abuse or failed to protect the child from severe child abuse.

As relevant here, Tenn. Code Ann. § 37-1-102(b)(27)(E) defines "severe child abuse" as "[t]he ingestion of an illegal substance or a controlled substance by a child under eight (8) years of age that results in the child testing positive on a drug screen, except as legally prescribed to the child."

The Department entered into evidence the November 30, 2023 order adjudicating the child dependent and neglected and finding that she was the victim of severe child abuse as defined above. In the November 30, 2023 order, the court found that Mother knowingly perpetrated the severe abuse because she admitted that she used illegal drugs after learning that she was pregnant despite her doctor advising her that using illegal drugs could be

---

[2] Although Mother does not challenge this ground on appeal, we must follow our Supreme Court's directive to analyze all termination grounds found by the trial court. *See In re Carrington H.*, 483 S.W.3d at 525 ("[T]he Court of Appeals must review the trial court's findings as to each ground for termination.").

harmful to the child. This Court has repeatedly "applied the doctrine of *res judicata*[3] to prevent a parent from re-litigating whether she committed severe child abuse in a later termination of parental rights proceeding, when such a finding had been made in a previous dependency and neglect action." *In re Heaven L.F.*, 311 S.W.3d 435, 439 (Tenn. Ct. App. 2010); *see also In re Sawyer B.*, No. E2023-01497-COA-R3-PT, 2025 WL 1276693, at \*7 (Tenn. Ct. App. May 2, 2025). Mother did not appeal the November 30, 2023 order, and it is final. The doctrine of res judicata, therefore, applies to this ground. We affirm the juvenile court's conclusion that DCS established this termination ground by clear and convincing evidence.

### c. Failure to manifest an ability and willingness to care for the child[4]

Finally, the trial court terminated Mother's parental rights pursuant to Tenn. Code Ann. § 36-1-113(g)(14). This ground requires a party to prove two elements by clear and convincing evidence. *See* Tenn. Code Ann. § 36-1-113(c)(1), (g)(14). First, a party must prove that the parent failed to manifest "an ability and willingness to personally assume legal and physical custody or financial responsibility of the child[ren]." Tenn. Code Ann. § 36-1-113(g)(14). Second, a party must prove that placing the children in the parent's "legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[ren]." Tenn. Code Ann. § 36-1-113(g)(14).

To establish the first prong, the party seeking to terminate parental rights need only prove that a parent failed to manifest either an ability or a willingness to assume custody. *In re Neveah M.*, 614 S.W.3d 659, 677 (Tenn. 2020) (citing *In re Amynn K.*, No. E2017-01866-COA-R3-PT, 2018 WL 3058280, at \*13-14 (Tenn. Ct. App. June 20, 2018)). "Ability focuses on the parent's lifestyle and circumstances[,]" and willingness focuses on the parent's attempts "to overcome the obstacles that prevent [him or her] from assuming custody or financial responsibility for the child." *In re Serenity W.*, No. E2018-00460-COA-R3-PT, 2019 WL 511387, at \*6 (Tenn. Ct. App. Feb. 8, 2019). Thus, a parent's mere desire to reunite with his or her child is insufficient to demonstrate an ability or a willingness. *See In re Nicholas C.*, No. E2019-00165-COA-R3-PT, 2019 WL 3074070, at \*17 (Tenn. Ct. App. July 15, 2019).

---

[3] The doctrine of res judicata applies if "an existing final judgment rendered upon the merits, without fraud or collusion, by a court of competent jurisdiction, is conclusive of rights, questions and facts in issue as to the parties and their privies, in all other actions in the same or any other judicial tribunal of concurrent jurisdiction." *Galbreath v. Harris*, 811 S.W.2d 88, 90 (Tenn. Ct. App. 1990).

[4] Mother raises this ground as "Issue II" in the "Statement of the Issues" section of her appellate brief. In the "Argument" section of her brief, however, she argues that "[t]he trial court failed to demonstrate that the mother had not made a lasting adjustment of circumstances to resume custody of the child." This argument appears to reference one of the best interest factors. *See* Tenn. Code Ann. § 36-1-113(i)(1)(J). Despite Mother's failure to provide an argument addressing this termination ground, we will analyze it as required by *In re Carrington H.*, 483 S.W.3d at 525.

Here, by the time of trial, Mother had done several positive things. She took steps to address her mental health by taking a mental health assessment and receiving mental health treatment at the Helen Ross McNabb Center. She also maintained her Social Security income, regularly visited the child, and obtained appropriate housing. However, Mother's drug use—the issue that caused the child's removal from her custody—remained an obstacle. Although Mother participated in three drug rehabilitation programs and had more than thirty negative drug screens, she repeatedly tested positive for drugs on nail bed drug screens. Most notably, she had four positive nail bed drug screens after completing the last rehabilitation program. Based on this evidence, the juvenile court found that Mother failed to maintain her sobriety and, therefore, "failed to manifest an ability and willingness to personally assume legal and physical custody" of the child. We agree.

Regarding the second prong, the record contains clear and convincing evidence to support the juvenile court's finding that placing the child in Mother's custody "would pose a risk of substantial harm to the physical or psychological welfare of the child." "Substantial harm" requires "'a real hazard or danger that is not minor, trivial, or insignificant'" and, "'[w]hile the harm need not be inevitable, it must be sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not.'" *In re Maya R.*, No. E2017-01634-COA-R3-PT, 2018 WL 1629930, at *8 (Tenn. Ct. App. Apr. 4, 2018) (quoting *Ray v. Ray*, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001)). In analyzing this termination ground, we have held that a parent "with a significant, recent history of substance abuse, mental illness, and/or domestic violence could lead to a conclusion of a risk of substantial harm." *In re Brianna B.*, No. M2019-01757-COA-R3-PT, 2021 WL 306467, at *6 (Tenn. Ct. App. Jan. 29, 2021) (collecting cases).

Given that Mother continued to test positive for drugs throughout the custodial episode, even after participating in three drug rehabilitation programs, we agree with the juvenile court's finding that placing the child with her poses a risk of substantial harm to the child's physical and psychological welfare. We conclude that this termination ground was proven by clear and convincing evidence.

II.     Best interest

Having determined that clear and convincing evidence of at least one statutory ground exists to terminate Mother's parental rights, we must next consider whether the trial court properly determined that termination of Mother's parental rights was in the best interest of the children. *See* Tenn. Code Ann. § 36-1-113(c)(2); *In re Audrey S.*, 182 S.W.3d 838, 860 (Tenn. Ct. App. 2005). After a court finds that clear and convincing evidence exists to support a ground for termination, the child's interests diverge from those of the parent and the court focuses on the child's best interests. *In re Audrey S.*, 182 S.W.3d at 877. A court must view the child's best interest from the perspective of the child, not that of the parent. *Id.* at 878. A finding that at least one ground for termination of parental rights exists does not necessarily require that a parent's rights be terminated. *Id.* at 877. Because

some parental misconduct is redeemable, our termination of parental rights statutes recognize that "terminating an unfit parent's parental rights is not always in the child's best interests." *Id.*

When examining the best interest of the children in the termination of parental rights context, we are directed by statute to consider the nonexclusive factors listed in Tenn. Code Ann. § 36-1-113(i)(1).[5] The statute enumerates factors that the court "shall consider," *In re Angela E.*, 303 S.W.3d at 251, but a court is not required to find that each of the enumerated factors exists before concluding that it is in the best interest of the child to terminate a parent's rights. *In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005). The statute similarly does not call for a mechanical determination of each of the statute's factors; rather, the relevancy and weight of each factor will be unique to each case. *In re Marr*, 194 S.W.3d 490, 499 (Tenn. Ct. App. 2005).Therefore, in certain circumstances, the consideration of one factor may be determinative. *Id.* (citing *In re Audrey S.*, 182 S.W.3d at 878). However, this does not relieve a court of its duty to consider each factor and, even in cases where one factor is outcome-determinative, the court must consider all factors and relevant proof that a party offers. *In re Gabriella D.*, 531 S.W.3d 662, 682 (Tenn. 2017). Because "there exists a significant overlap between some factors," they may be discussed by groups "based on the[ir] overarching themes." *In re Chayson D.*, No. E2022-00718-COA-R3-PT, 2023 WL 3451538, at *14 (Tenn. Ct. App. May 15, 2023).

The facts a court considers in its best interest analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." *In re Kaliyah S.*, 455 S.W.3d 533, 555 (Tenn. Ct. App. Tenn. 2015). Once a court makes the underlying factual findings, it should "consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest." *Id.*

We begin with the factors that the juvenile court found did not favor termination of Mother's parental rights: (D) ("Whether the parent and child have a secure and healthy parental attachment, and if no, whether there is a reasonable expectation that the parent can create such attachment"), (E) ("Whether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child"), (F) ("Whether the child is fearful of living in the parent's home"), (P) ("Whether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive"), (R) ("Whether the physical environment of the parent's home is healthy and safe for the child or any other child"), and (S) ("Whether

---

[5] The general assembly amended the best interest factors in 2021, several years before DCS filed the petition to terminate Mother's parental rights. *See* 2021 TENN. PUB. ACTS ch. 190 § 1 (S.B. 205), eff. April 22, 2021. Mother cites to and applies the old best interest factors in her brief. The juvenile court correctly applied the current factors. *See In re Braxton M.*, 531 S.W.3d 708, 732 (Tenn. Ct. App. 2017) (holding the version of a termination statute "'that was in force when the petition was filed governs this case'") (quoting *In re Tianna B.*, No. E2015-02189-COA-R3-PT, 2016 WL 3729386, at *7 (Tenn. Ct. App. July 6, 2016)).

the parent has consistently provided more than token financial support for the child"). The record shows that Mother visited the child regularly. The DCS caseworker who supervised many of Mother's visits with the child testified that the child did not seem to fear Mother and that Mother and the child did not have a negative relationship. The caseworker observed, however, that the child was more subdued during visits with Mother than she was with the foster parents. The child was removed from Mother's custody immediately after the child was born, and Mother never moved beyond supervised visits with the child. Therefore, the child was never in Mother's home. The caseworker stated that Mother had safe, appropriate, and stable housing. As for providing financial support, the record shows that Mother had no child support obligation because her only source of income was her Social Security income. Mother took a parenting class and, as the juvenile court found, her testimony demonstrated that she understood what the child needed to thrive. We agree with the juvenile court that these factors do not favor terminating Mother's parental rights.

The juvenile court found that factor (G) did not apply. This factor concerns "[w]hether the parent, parent's home, or others in the parent's household trigger or exacerbate the child's experience of trauma or post-traumatic symptoms." Tenn. Code Ann. § 36-1-113(i)(1)(G). The record contains no evidence that the child experienced any trauma. Therefore, we agree with the juvenile court that this factor does not apply.

The juvenile court next found that the record lacked sufficient evidence to support a finding for factor (O). *Id.* § 36-1-113(i)(1)(O) ("Whether the parent has ever provided safe and stable care for the child or any other child"). The record preponderates against this finding. Though silent about whether Mother ever cared for any other child, the record shows that Mother never provided safe and stable care for the child at issue in this case because the child was removed from her custody immediately after being born. This factor favors termination.

We turn now to factors that this Court has previously considered as "related to the child's emotional needs." *In re Chayson D.*, 2023 WL 3451538, at *14; *see also* Tenn. Code Ann. § 36-1-113(i)(1)(A) (involving the effect termination will have on the child's need for stability), (B) (considering the effect a change in caretakers would have on the child's wellbeing), (H) (concerning whether the child is attached to another parental figure), (I) (considering the child's relationships with others), and (T) (involving the effect the parent's mental and emotional fitness has on the child). We agree with the juvenile court's finding that terminating Mother's parental rights would have a positive effect on the child's need for stability. The record shows that the child has lived with the foster family since she was a few days old, and she is bonded to the entire foster family. The foster mother testified that she and her husband wish to adopt the child if she becomes available for adoption. In contrast, Mother's emotional fitness would be detrimental to the child because, despite participating in three drug rehabilitation programs, mental health treatment, and narcotics anonymous, she continued to test positive for drugs. *See In re Quinton A.*, No. E2024-01678-COA-R3-PT, 2025 WL 1228615, at *9 (Tenn. Ct. App. Apr.

29, 2025) (stating that "removing the children from the foster home and returning them to [f]ather's custody would have a negative effect on the children, based in part on [f]ather's continued drug use and in part on the children's bond with the foster family"); *In re Bentley R.*, No. W2023-01665-COA-R3-PT, 2024 WL 3443817, at \*14 (Tenn. Ct. App. July 17, 2024) (stating that the parent's "history of struggle in breaking the cycle of drug use" constituted evidence of the parent's "lack of emotional fitness"). Furthermore, the child has several medical needs stemming from exposure to drugs in utero. The foster family has consistently provided for the child's medical needs. It is unlikely that Mother will be able to care for the child's various medical needs given her inability to address her own drug abuse issues. Thus, changing caretakers would be detrimental to the child's wellbeing. *See In re Daylan D.*, No. M2020-01647-COA-R3-PT, 2021 WL 5183087, at \*13 (Tenn. Ct. App. Nov. 9, 2021) (stating that a change in caretakers would be detrimental to the children because one child had medical issues for which the foster family was well-equipped, but the father was not, evidenced by his inability to address his own issues when caring only for himself). We, therefore, agree with the juvenile court that these factors favor termination of Mother's parental rights.

The factors we look to next concern the physical environment of the child and the parent. Tenn. Code Ann. § 36-1-113(i)(1)(N) (considering any abuse or neglect in the parent's home), (Q) (considering whether the parent has demonstrated a commitment to providing a home that meets the child's needs). The child was a victim of severe child abuse perpetrated by Mother, who knowingly using drugs while pregnant with the child. At the time of trial, Mother had maintained appropriate housing for a year and a half, but the evidence established that she still could not provide a home free of drugs because she continued to test positive for drugs. *See In re Quinton A.*, 2025 WL 1228615, at \*10 (finding that the father's "continued drug use reflects negatively on the health and safety of any future home"). These factors heavily favor termination of Mother's parental rights.

Finally, we address the remaining factors that relate to the parent's efforts. *See* Tenn. Code Ann. § 36-1-113(i)(1)(C) (considering whether the parent has demonstrated continuity in meeting the child's needs), (J) (involving whether the parent has demonstrated a lasting adjustment of circumstances),[6] (K) (concerning whether the parent has taken advantage of available resources), (L) (involving whether DCS made reasonable efforts), (M) (considering whether the parent has demonstrated a sense of urgency). Mother made several positive strides during this custodial episode. She regularly visited with the child, received mental health treatment, completed an intensive outpatient drug treatment program at Great Starts, and passed many urine drug screens. Nevertheless, she continued to test positive for drugs on nail bed drug screens even after completing the Great Starts

---

[6] In its order terminating Mother's parental rights, the juvenile court found that the record contained insufficient evidence to support a finding for this factor. Respectfully, we disagree. The record contains ample evidence related to Mother's efforts to make an adjustment of circumstances and to her failures to make a lasting adjustment.

program and having almost two years to address her drug abuse issue. Despite being relieved of making reasonable efforts, DCS assisted Mother by developing several permanency plans, administering numerous drug screens, and facilitating visitation with the child, including therapeutic visitation. These factors weigh in favor of termination of Mother's parental rights.

In sum, the majority of the factors weigh in favor of terminating Mother's parental rights. Although "determination of the child's best interest may not be reduced to a simple tallying of the factors for and against termination, especially considering the similarities between the factors," when viewing these factors from the child's perspective, we must conclude that the most important factors here are Mother failing to make a lasting change of circumstances by continuing to struggle with drugs and the detrimental effect that a change in caretakers and environment would cause the child. *In re Chayson D.*, 2023 WL 3451538, at *15 (citation omitted). Therefore, we conclude that DCS proved by clear and convincing evidence that termination of Mother's parental rights was in the child's best interest.

CONCLUSION

The judgment of the trial court is affirmed. Costs of this appeal are assessed against the appellant, Aliyah S., for which execution may issue if necessary.

/s/ Andy D. Bennett
ANDY D. BENNETT, JUDGE

- 12 -